This Opinion is a
Precedent of the TTAB

Hearing: November 30, 2017                    Mailed: January 11, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

\_\_\_\_

Trademark Trial and Appeal Board

\_\_\_\_

*In re Wal-Mart Stores, Inc.*

\_\_\_\_

Serial No. 86261962

\_\_\_\_

Gary J. Rinkerman, Brian A. Coleman and Philip J. Cardinale of Drinker Biddle &
    Reath LLP, for Wal-Mart Stores, Inc.

Barbara Brown, Trademark Examining Attorney[1], Law Office 116,
    Christine Cooper, Managing Attorney.

\_\_\_\_

Before Mermelstein, Lykos and Kuczma,
    Administrative Trademark Judges.

Opinion by Kuczma, Administrative Trademark Judge:

Wal-Mart Stores, Inc., ("Applicant") seeks registration on the Principal Register

of the mark INVESTING IN AMERICAN JOBS (in standard characters) for:

> promoting public awareness for goods made or assembled
> by American workers; Retail store services featuring a
> wide variety of consumer goods; Retail grocery stores;
> Retail store services featuring a wide variety of consumer
> goods of others; Retail store services featuring electronics,
> appliances, indoor and outdoor furniture, home décor,

---

[1] This application was originally assigned to Trademark Examining Attorney Sui Q. Duong but subsequently reassigned to Trademark Examining Attorney Barbara Brown who represented the USPTO in this appeal.

health, beauty and personal care products, household essentials, apparel, home improvement products, grilling products, entertainment recordings, video games, books and publications, musical instruments, office supplies, arts and craft supplies; online retail store services featuring a wide variety of consumer goods; Online retail grocery stores; Online retail store services featuring a wide variety of consumer goods of others; Online retail store services featuring electronics, appliances, indoor and outdoor furniture, grilling products, home improvement products, home décor, health, beauty and personal care products, household essentials, apparel, entertainment recordings, video games, books and publications, musical instruments, office supplies, arts and craft supplies; Retail and on-line grocery store services featuring pickup, in-store pickup and home delivery service; Retail store services featuring convenience store items and gasoline; Convenience store services in International Class 35.[2]

The Trademark Examining Attorney refused registration under Sections 1-3 and 45 of the Trademark Act, 15 U.S.C. §§ 1051-1053, 1127, on the ground that the phrase INVESTING IN AMERICAN JOBS fails to function as a mark for the applied-for services because it is merely informational and commonly used as a slogan in advertising and promotional efforts to signify businesses' engagement in activities to encourage development of employment opportunities in the United States and promote the U.S. economy.

When the refusal was made final, Applicant filed a notice of appeal and requested reconsideration. After the Examining Attorney denied the request for

---

[2] Application Serial No. 86261962 was filed on April 24, 2014, under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on Applicant's allegation of a *bona fide* intention to use the mark in commerce. A Statement of Use was filed on March 17, 2015, alleging first use of the mark in commerce at least as early as February 28, 2014.

reconsideration, the appeal was resumed. Applicant and the Examining Attorney filed briefs and presented oral argument. We affirm the refusal to register.

**Failure to Function as a Mark**

"Before there can be registration, there must be a trademark." *In re Roberts*, 87 USPQ2d 1474, 1478 (TTAB 2008) (quoting *In re Bose Corp*, 546 F.2d 893, 192 USPQ 213, 215 (CCPA 1976)); *see also D.C. One Wholesaler, Inc. v. Chien*, 120 USPQ2d 1710, 1716 (TTAB 2016). We look first to the definition of a "service mark" which is defined as any word, name, symbol, or device, or any combination thereof–

> (1) used by a person, or
>
> (2) …
>
> to identify and distinguish the services of one person, including a unique service, from the services of others and to indicate the source of the services, even if that source is unknown. …

Section 45 of the Trademark Act, 15 U.S.C. § 1127.

Section 2 of the Trademark Act, 15 U.S.C. § 1052, connotes that a "trademark"[3] must in fact function as a trademark, *i.e.*, indicate source, to be eligible for registration:

> No trademark *by which the goods of the applicant may be distinguished from the goods of others* shall be refused registration on the principal register on account of its nature unless … . (emphasis added).

---

[3] Section 3 of the Trademark Act, 15 U.S.C. § 1053, recognizes service marks as being registrable in the same manner and with the same effect as trademarks. *In re Wakefern Food Corp.*, 222 USPQ 76, 77 (TTAB 1984).

Not every word or symbol which appears in connection with an entity's services functions as a service mark. *In re Safariland Hunting Corp.*, 24 USPQ2d 1380, 1381 (TTAB 1992); *In re Remington Prods. Inc.*, 3 USPQ2d 1714, 1715 (TTAB 1987). Thus, a threshold issue in some cases (like this one) is whether the phrase in question in fact functions to identify the source of the services recited in the application and distinguish them from the services of others or, instead, would be perceived merely as communicating the ordinary meaning of the words to consumers. To put this inquiry in context, it is helpful to note that we, our primary reviewing court (the Federal Circuit and its predecessor the Court of Customs and Patent Appeals), and other federal appeals courts, draw a distinction between words used to "identify and distinguish" source, and words used in their ordinarily-understood meaning to convey information other than source-identification. For example:

> The words GUARANTEED STARTING "are well understood, English words in common use" that, in the context of "advertisements displayed by an automobile service station" would be understood in their ordinary meaning rather than read as having "some special meaning distinguishing the services advertised from similar services of other station operators." *In re Standard Oil Co.*, 275 F.2d 945, 125 USPQ 227, 229 (CCPA 1960);

> The words YOU HAVE MAIL to indicate that an AOL email service user, in fact, has email in his or her email-box (*i.e.*, the words YOU HAVE MAIL "fall[ ] within the heartland of common meaning and usage" of those words rather than identifying and distinguishing AOL's email services from those of other providers, and therefore are not enforceable trademarks. *Am. Online, Inc. v. AT&T Corp.*, 243 F.3d 812, 57 USPQ2d 1902, 1909 (4th Cir. 2001);

> "[T]he challenged phrase 'Seal it with a Kiss' (with or without the two exclamation points) is a clear instance of a non-trademark use of words…. The [plaintiff's] phrase

'sealed with a kiss' is a fixture of the language" and thus is "non-trademark use" in connection with a lipstick promotional display. *Cosmetically Sealed Indus. Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 43 USPQ2d 1956, 1958 (2d Cir. 1997);

THE BEST BEER IN AMERICA was held unregistrable for beer and ale because the mark would be perceived as a common, laudatory advertising phrase and not a trademark. *In re Boston Beer Co.*, 198 F.3d 1370, 53 USPQ2d 1056, 1058-59 (Fed. Cir. 1999);

ONCE A MARINE, ALWAYS A MARINE would not be perceived as a trademark for clothing but rather as an informational slogan "to express support, admiration or affiliation with the Marines." *In re Eagle Crest*, 96 USPQ2d 1227, 1232 (TTAB 2010);

DRIVE SAFELY was held unregistrable because it would be perceived only as an everyday, commonplace safety admonition and not as a trademark for automobiles and structural parts. *In re Volvo Cars of N. Am.*, 46 USPQ2d 1455, 1461 (TTAB 1998);

PROUDLY MADE IN USA for electric shavers and parts would be perceived not as a source indicator but instead as an informational slogan. *In re Remington Prods.*, 3 USPQ2d at 1715; and

THINK GREEN for mailing and shipping boxes, and for weatherstripping, would not be perceived as an indicator of source, but simply as a slogan of environmental awareness and ecological consciousness. *In re Manco Inc.*, 24 USPQ2d 1062, 1066 (TTAB 1992).

With this background, we now turn to consider the evidence. A critical element in determining whether a term or phrase is a service mark is the commercial impression the term or phrase makes on the relevant public, *i.e.*, whether the phrase sought to be registered would be perceived as a mark identifying the source of the services, or as something else. *See, e.g.*, *D.C. One Wholesaler v. Chien*, 120 USPQ2d at 1713. To

make this determination, we look to the specimens and other evidence of record showing the phrase used in the marketplace to determine how consumers likely would perceive the subject matter sought to be registered. *See In re Bose*, 192 USPQ at 216; *In re Eagle Crest*, 96 USPQ2d at 1229; *In re Phoseon Tech. Inc.*, 103 USPQ2d 1822, 1828 (TTAB 2012); *In re Roberts*, 87 USPQ2d at 1478; *In re Volvo Cars*, 46 USPQ2d at 1459; *In re Safariland*, 24 USPQ2d at 1381; *In re Remington Prods.*, 3 USPQ2d at 1715; *In re Wakefern Food Corp.*, 222 USPQ at 77; *In re Morganroth*, 208 USPQ 284, 287 (TTAB 1980). We first consider the evidence of Applicant's use and then the evidence of third-party use.

A. Applicant's Use

Applicant's specimen (see below) shows INVESTING IN AMERICAN JOBS, together with the "Walmart & the Spark Design" mark, used on shelf-talker signage located in Applicant's retail stores and positioned in close proximity to goods that it designates as made by American workers[4]:

---

[4] November 18, 2015 Response to Office Action at 11-12. Citations to the prosecution history in the application are to the downloadable .pdf version of the Trademark Status & Document Retrieval Database (TSDR).



Applicant submitted evidence explaining that, as used on this shelf-talker specimen (along with other displays), INVESTING IN AMERICAN JOBS "indicates that the service area and/or designated offering of goods features products made or assembled in America."[5] Applicant also uses INVESTING IN AMERICAN JOBS on its website "to promote awareness of goods made or assembled by U.S. workers … as well as to promote gatherings for U.S. manufacturers hosted by [Applicant] that have been branded with the text INVESTING IN AMERICAN JOBS."[6] For example, the webpage entitled "Investing in American Jobs" states that "We believe we can create more American jobs by supporting more American manufacturing…Together we can help spark a revitalization of U.S.-based manufacturing. By making production more

---

[5] Declaration of Joseph Taliaferro, Senior Director of Brand ¶ 5, January 4, 2017 Request for Reconsideration at TSDR 125.

[6] Id; see also Request for Reconsideration at TSDR 26-29 "Investing in American Jobs" title on Applicant's website; at TSDR 40 for text of speech to U.S. Conference of Mayors on January 23, 2014, titled "Creating Opportunity by Investing in American Jobs" posted on Applicant's website; and at TSDR 50-66 (also submitted with March 3, 2017, Request for Reconsideration Denied at TSDR 51) "Walmart * Investing in American Jobs" and "Investing in American Jobs at Walmart" title of articles by Applicant.

affordable and feasible in the United States, we can bring our customers more U.S.-made products and manufacturers can create more jobs in America."[7]

The mere fact that a phrase proposed for registration appears on the specimens of record does not establish its use as a service mark. *See In re Safariland Hunting*, 24 USPQ2d at 1381. As we pointed out in *Remington Prods.,* 3 USPQ2d at 1715:

> [T]he mere fact that applicant's slogan appears on the specimens, even separate and apart from any other indicia which appear on them, does not make it a trademark. To be a mark, the term, or slogan, must be used in a manner calculated to project to purchasers or potential purchasers a single source or origin for the goods in question. Mere intent that a term function as a trademark is not enough in and of itself, any more than attachment of the trademark symbol would be, to make a term a trademark.

The slogan INVESTING IN AMERICAN JOBS is like other statements that would ordinarily be used in business or industry, or by certain segments of the public generally, to convey support for American-made goods, and thus would not be recognized as indicating source and are not registrable. *See, e.g., In re Remington Prods.*, 3 USPQ2d at 1715 (PROUDLY MADE IN USA for electric shavers and parts thereof would not be recognized as source indicator); *see also In re Eagle Crest*, 96 USPQ2d at 1232 (ONCE A MARINE, ALWAYS A MARINE for clothing); *In re Volvo Cars,* 46 USPQ2d at 1461 (DRIVE SAFELY for automobiles ); *In re Manco*, 24 USPQ2d at 1941 (THINK GREEN for mailing and shipping boxes and for weatherstripping); *In re Niagara Frontier Servs., Inc.,* 221 USPQ 284, 285 (TTAB

---

[7] <http://corporate.walmart.com/global-responsibility/opportunity>, attached to the December 14, 2015 Office Action.

1983) (WE MAKE IT, YOU BAKE IT! for supermarket store services); *In re Tilcon Warren, Inc.*, 221 USPQ 86, 88 (TTAB 1984) (WATCH THAT CHILD for construction materials); *In re Morganroth*, 208 USPQ at 288 (NATUR-ALL-IZE YOUR HAIR COLORING for hair styling salon services). These slogans all are informational in nature, expressing various sentiments using words that convey their ordinary meanings rather than indicating source.

Similarly, we find that consumers would perceive INVESTING IN AMERICAN JOBS as merely an informational statement that Applicant is selling certain goods that are made or assembled in America in areas of the store where the signage appears. It would not be perceived as a service mark for "promoting public awareness for goods made or assembled by American workers" and the various retail store services recited in the application, but instead would be perceived as informing consumers that the goods are made or assembled by U.S. workers and expressing enthusiasm for the creation of jobs in the United States. The text on Applicant's website confirms the merely informational nature of the phrase. Thus, the commonplace meaning imparted by the phrase INVESTING IN AMERICAN JOBS would be the meaning impressed upon the purchasing public.[8]

---

[8] This is further amplified by the fact that the specimen also bears another designation that clearly identifies source, namely, the "Walmart & the Spark Design" mark. *See, e.g., In re J. Hungerford Smith Co.*, 279 F.2d 694, 126 USPQ 372, 373 (CCPA 1960) (where specimen bore the applicant's house marks "J. Hungerford Smith's" and "J H S" as well as the applied-for term BURGUNDY on flavoring syrup made from Burgundy cherries, the Board correctly found that the term BURGUNDY was "not used in a trademark sense").

B.      Third-Party Usage

Common use of a phrase by third parties merely for the purpose of imparting information makes it less likely that the public will perceive it as identifying a single commercial source and less likely that it will be recognized by purchasers as a trademark. *See, e.g., In re Eagle Crest*, 96 USPQ2d at 1229; *Reed v. Amoco Oil Co.*, 611 F. Supp. 9, 225 USPQ 876, 877 (M.D. Tenn. 1984); *see also In re Boston Beer*, 53 USPQ2d at 1058. Although we deem the evidence of Applicant's use of the phrase INVESTING IN AMERICAN JOBS sufficient to find that it does not function as a service mark for "promoting public awareness for goods made or assembled by American workers" and the wide variety of retail store services listed in the application, the Examining Attorney also placed in the record many examples that third parties in several industries commonly use the phrase "investing in American jobs" to convey the same general idea (supporting American jobs) as does Applicant, which demonstrates the public perception of the phrase as merely informational:

1. **Uses in connection with products offered for sale**:

- US Appliance®[9]

  GE Appliances Made In USA

  US Appliance is proud to offer products from GE Appliances. While not every GE product is made in the USA it is clear that GE is committed to manufacturing

---

[9] December 14, 2015 Office Action at TSDR 21; March 3, 2017 Request for Reconsideration Denied at TSDR 10.

many of their products in the USA and **investing in American Jobs**.[10]

*http://www.us-appliance.com/geappliancesmadeinusa .html* (12/13/2015)

- INDIEGOGO[11]

  Short Summary

  Ben Waxman along with his fiancé Whitney Reynolds, and parents, Dory and Dan Waxman are co-founders of American Roots. AR is a 100% American made textile company producing high quality Polartec fleece outer wear. …

  The Impact

  By contributing to the American Roots campaign you are investing in people. You are **investing in American jobs**. You are investing in a movement….

  *https://www.indiegogo.com/projects/american-roots-creating-jobs-in-the-usa#/* (7/7/2016)

- Green Light Renewable Services[12]

  Why should you invest in a solar energy system?

  …

  Invest in the American economy

  We strive to provide equipment made here in America. By investing in a solar PV system through Green Light, you are **investing in American jobs** and the economy.

  *http://www.greenlightrenew.com/gosolar* (7/7/2016)

---

[10] The phrase "investing in American jobs" is emphasized in each of the cited sources for the reader's convenience.

[11] July 7, 2016 Office Action at TSDR 5.

[12] *Id.* at TSDR 6.

- Absolutely organic baby[13]

  Holy Lamb Organics Wool Cradle Mattress

  …

  Product Description

  …

  The wool in this mattress comes from US sheep farmers. When you purchase this cradle mattress you are **investing in American jobs** and helping to preserve and sustain the farmer's way of life. …

  *http://www.absolutelyorganicbaby.com/holy-lamb-organics-wool-cradle-mattress/* (7/7/2016)

- SHATTERLABELS.com[14]

  **Investing in American Jobs**

  We at ShatterLabels.com believe in making a difference and supporting the issues that our customers and communities care about …

  *http://shatterlabels.com/investing-in-american-jobs* (2/27/2017)

2. **Uses in titles and text of media and news articles**:

- Nippon Sharyo Manufacturing Shop 3 shows that investing in American rail is **investing in American jobs**[15]

  In Rochelle, Illinois, Nippon Sharyo already has 260 men and women working at its railcar assembly plant. …

  *http://blogarchive.dot.gov/blog-archive/secretaryeblog/2013/06/investing-in-rail-means-investing-in-american-jobs-and-american-workers.html#* (12/13/2015)

---

[13] *Id.* at TSDR 8.

[14] March 3, 2017 Request for Reconsideration Denied at TSDR 4.

[15] December 14, 2015 Office Action at TSDR 16.

- CGI's U.S. Onshore Delivery Model[16]

  …

  **Investing in American jobs**, talent and communities

  CGI is dedicated to creating jobs in U.S. communities and we partner with the area's local colleges and universities to help bring well-trained students into the workforce. …

  CGI Group Inc. brochure, January 2017

- President Obama Promotes Local Jobs and Tourism While Protecting National Treasures[17]

  … In the Organ Mountains-Desert Peaks region alone, recent independent studies show that today's designation could double the number of visitors to the area and generate $7.4 million in new economic activity each year. By taking this step, the President is **investing in American jobs** and American businesses. …

  *https://www.whitehouse.gov/blog/2014/05/23/presiden t-obama-promotes-local-jobs-and-tourism-while-protectin g-national-treasures* (12/13/2015)

- Triangle Coalition for STEM Education[18]
  Stem Education News

  May 2, 2013

  Discovery Launches New, Free STEM Education Resources

  …

  "As President Obama said at the latest White House Science Fair, when we inspire students to excel in math and science, we are **investing in American jobs** and industries of the future," said John P. Holdren, Assistant to the President for Science and Technology and Director

---

[16] March 3, 2017 Request for Reconsideration Denied at TSDR 35.

[17] December 14, 2015 Office Action at TSDR 15.

[18] *Id.* at TSDR 17.

of the White House Office of Science and Technology Policy. …

*http://www.trianglecoalition.org/bulletin/may-2-2013* (12/13/2015)

- Investing[19]

  Frenemy China Helping American Job Market

  Long seen as the arch enemy to the America job market, China is now at least becoming more friend than foe. …

  And so that means China is getting richer, and they are buying up American products and their companies are investing in U.S. companies. By default, they are **investing in American jobs**. …

  *http://www.forbes.com/sites/kenrapoza/2013/05/03/fre nemy-china-helping-american-job-market/* (12/12/2015)

- The Detroit Bureau[20]

  UAW Makes Note of GM's Improved Profitability

  Union looking for its share of the money during talks.

  …Cathy Clegg, GM's vice president of labor relations, has credited the union with helping to boost the quality of GM's vehicles and the company has made several announcements during the winter and spring that highlighted the company's commitment to **investing in American jobs** and American workers. …

  *http://www.thedetroitbureau.com/2015/07/uaw-makes-note-of-gms-improved-profitability/* (12/13/2015)

- Breathe Healthier Air[21]

  Solar Heating in Stuart, FL by Breathe Healthier Air

---

[19] *Id.* at TSDR 18.

[20] *Id.* at TSDR 19.

[21] *Id.* at TSDR 20; March 3, 2017 Request for Reconsideration Denied at TSDR 27.

Using the sun as a source of heating is nothing new. … A Growing Industry: Solar heating systems and other solar technologies are on the rise, which means the solar industry creates new jobs all the time. Investing in this technology means **investing in American jobs**. …

*http://www.breathehealthierair.com/heating/solar-heating/* (12/13/2015)

- Purchasing Product From Quality Clothing Brands[22]

  Written by Feltraiger–September 24, 2015

  Quality clothing brands have become a bit of a hot topic lately, but it's what Feltraiger was founded on. …

  The Solution: Purchase From Quality Clothing Brands

  Purchasing from American made quality clothing brands is a great way to solve this problem. When you shop with smaller American brands you are **investing in American jobs** and the American work force. …

  *http://www.feltraiger.com/blogs/news/51527940-purchasing-product-from-quality-clothing-brands* (7/7/2016)

- PediSand A Hands Free Foot File[23]

  Big News, PediSand A Hands Free Foot File got a deal with Walmart! …They are **investing in American Jobs**, especially in rural areas. …

  *https://www.facebook.com/PediSand-A-Hands-Free-Foot-File-15439885579211161/* (7/7/2016)

- Ethanol Producer Magazine[24]

  Higher Blends Best For America's Energy Future

---

[22] July 7, 2016 Office Action at TSDR 7.

[23] *Id.* at TSDR 9.

[24] *Id.* at TSDR 10.

The greatest challenge the ethanol industry faces is making higher blends of our product available to consumers nationwide. …

For anyone who is paying attention, E15 is the clear choice. Consumers can rest easy knowing that by using homegrown renewable fuels they are **investing in American jobs** and the American economy. …

*http://ethanolproducer.com/articles/11244/higher-blends-best-for-americanundefineds-energy-future* (7/7/2016)

- Linkedin®

  **Investing in American jobs**[25]

  Rich King, President Abstrax Llc.

  Abstrax would like to extend its gratitude to all of our new clients who decided, quality does matter.

  In just the last few months [w]e have been able to add 25 full-time positions to the American workforce! …

  *https://www.linkedin.com/pulse/investing-american-jobs-rich-king* (2/27/2017)

- wksu 89.7[26]

  Trade Ranks High Among Ohio Voter Concerns in This Election

  … [Alan Tonelson, an economist who has written about Trump's proposal to rewrite NAFTA] … complicating the argument that trade is either good or bad, noted that Honda, a Japanese-owned auto manufacturer, is **investing in American jobs** as domestic companies like Ford and General Motors have laid off tens of thousands since 2000. …

---

[25] March 3, 2017 Request for Reconsideration Denied at TSDR 7.

[26] *Id.* at TSDR 16.

*http://wsku.org/post/trade-ranks-high-among-ohio-voter-concerns-election#stream/0 (3/3/2017)*

- Automotive Minute: Nissan's 30-year commitment to U.S. manufacturing continues to grow[27]

  …Additionally, Nissan's Smyrna, Tenn., operation makes parts to be exported with over 1.1 million U.S. made vehicles having been sent around the world in the last 30 years.

  That Vehicle Assembly Plant isn't the only place Nissan is **investing in American jobs**. In 1997 Nissan opened its Decherd Powertrain Plant just down the road…

  *http://www.bizjournals.com/atlanta/news/2016/06/15 /automotive-minute-nissan-s-30-year-commitment-to-u.html* (03/03/2017)

- Tampa Bay Times[28]

  Column: Welcome to Donald Trump's power of now

  … Trump's news to the workers of Carrier was gloriously sudden and delivered like a campaign speech filled with achievement, attitude and perfectly unpolished rhetoric. My summary of his clear message:

  We are going to make **investing in American jobs**, job 1. And when we're finished, …

  *http:www.tampabay.com/opinion/columns/column-welcome-to-donald-trumps-power-of-now/2305191* (03/03/2017)

- Toyota joins in, announces 400 new jobs in Indiana[29]

  The company will invest more than $600 million into its Princeton, Indiana plant**.**

---

[27] *Id.* at TSDR 23.

[28] *Id.* at TSDR 38.

[29] *Id.* at TSDR 41.

Ford and GM aren't only two automakers **investing in American jobs**. Toyota today announced an expansion of its Princeton, Indiana plant …

*http://www.motor1.com/news/134367/toyota-announces-us-investment/* (03/03/2017)

- Vermont Furniture Blog[30]

Craftsman Furniture: An Investment You Can Appreciate

…

When you invest your money in tomorrow's Vermont made antiques, you are also **investing in American jobs** and in the future of American craft. …

*http://vermontfurnitureblog.com/craftsman-furniture-investment/* (03/03/2017)

The Examining Attorney contends the foregoing evidence shows the slogan INVESTING IN AMERICAN JOBS is widely used to refer to the "broad social, economic or altruistic goal of encouraging the development of employment opportunities in the United States, and therefore, it conveys an informational message about the business using the slogan, rather than functioning to distinguish the services of one provider from those of others with this same goal."[31] According to the Examining Attorney, because consumers consistently encounter this phrase used in an informational manner by many different service providers, they would not perceive the phrase as identifying a single commercial source.[32]

---

[30] *Id.* at TSDR 48.

[31] Examining Attorney's Appeal Brief 12 TTABVUE 10.

[32] Examining Attorney's Appeal Brief 12 TTABVUE 6.

Applicant contends that INVESTING IN AMERICAN JOBS is more than merely informational and functions as a source indicator for its services. Applicant asserts that the following evidence, which it provided, establishes that consumers associate the phrase with Applicant and should be given more weight in gauging public perception than the Examining Attorney's evidence: (1) "top line search results" displaying its use of the slogan;[33] (2) estimated expenditures of over $10 million since 2014 in connection with its asserted mark; (3) attendance by 5,700 people at promotional events featuring the slogan; and (4) more than 300,000 visits to its website, which displays the slogan "to promote its commitment to goods made or assembled in the United States."[34] In Applicant's view, its evidence is more objectively selected and representative of the marketplace than what Applicant characterizes as the "assortment of non-trademark uses of '. . . investing in American jobs' presented by the Examiner [that] merely shows that this sequence of words may be used in ordinary speech, especially in contexts such as the news articles and press releases cited by the Examiner that by their nature, tend to be perceived by readers as informational and tend to be less trafficked on the Internet than the sites demonstrating consistent trademark use over several years such as that engaged in by Appellant."[35] Applicant also contends that the Examining Attorney's evidence shows that the uses exist and is not probative to show common use of the phrase

---

[33] Applicant's Appeal Brief 10 TTABVUE 11-12, citing Exhibits B and C to the June 13, 2016 Response to Office Action and Ex. 1 to the January 4, 2017 Request for Reconsideration.

[34] Applicant's Appeal Brief 10 TTABVUE 13, citing Ex. 4 (Declaration of Joseph Taliaferro) to the January 4, 2017 Request for Reconsideration.

[35] Applicant's Appeal Brief 10 TTABVUE 10.

because it does not include the search terms used, which could have specifically targeted informational types of uses.[36] In Applicant's view, "something more" than that the uses exist is necessary, such as, "information as to the context as to the incidence rate of the phrase within the searches (*e.g.,* how many examples were eliminated from contention) or consumer engagement (*e.g.,* whether the cited webpages have significant web traffic)."[37]

We agree with the Examining Attorney that the third-party usage evidence shows the public would perceive INVESTING IN AMERICAN JOBS merely as an informational slogan rather than as a source indicator. We have carefully considered Applicant's arguments but they fail to persuade us that the phrase functions as a service mark for the applied-for services.

Beginning with Applicant's challenges to the competence of the evidence introduced by the Examining Attorney, it is well settled that articles obtained from the Internet, websites, and blog posts are admissible as evidence of information available to the consuming public and of the way in which a term is being used or would be understood by the relevant public. *See In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) ("Internet evidence is generally admissible and may be considered for purposes of evaluating a trademark."); *see also In re Geller,* 751 F.3d 1355, 110 USPQ2d 1867, 1870 (Fed. Cir. 2014) (the Board, in noting that "the probative value of the blog comments … is less than that of the

---

[36] Applicant's Appeal Brief 10 TTABVUE 9.

[37] *Id.*

articles themselves due to the anonymity of the authors," did not err in concluding that such comments shed light on the meaning of the term "Islamisation"); *In re Reed Elsevier Properties Inc.*, 482 F.3d 1376, 82 USPQ2d 1378, 1381 (Fed. Cir. 2007); TRADEMARK TRIAL AND APPEAL BOARD MANUAL OF PROCEDURE (TBMP) § 1208.03 (June 2018) ("Material obtained through the Internet or from websites is acceptable as evidence in ex parte proceedings."); TRADEMARK MANUAL OF EXAMINATION PROCEDURE (TMEP) § 710.01(b) (Oct. 2018) ("Articles downloaded from the Internet are admissible as evidence of information available to the general public, and of the way in which a term is being used by the public."). Inasmuch as the Examining Attorney's evidence consists of copies of complete webpages, it is probative of the meaning the phrase "investing in American jobs" has to consumers and how they would perceive it when used by Applicant for Applicant's services.[38] Nothing more is required for the kinds of evidence provided by the Examining Attorney to support a refusal that the public would perceive the slogan INVESTING IN AMERICAN JOBS to function not as a mark but instead as a merely informational expression of support for American workers.[39]

---

[38] Internet evidence that includes the URL and the date the material was accessed is generally admissible and may be considered for purposes of evaluating a trademark. *In re I-Coat Co., LLC.*, 126 USPQ2d 1730, 1733 (TTAB 2018); *In re Mueller Sports Medicine, Inc.*, 126 USPQ2d 1584, 1587 (TTAB 2018). Web-based information that includes greater context for the use of a term, such as a complete webpage, will have greater probative value in determining how a term will be perceived. *In re Bayer,* 82 USPQ2d at 1833; *see also In re Reed Elsevier Props.*, 82 USPQ2d at 1381; *In re King Koil Licensing Co.*, 79 USPQ2d 1048, 1050 (TTAB 2006).

[39] Applicant contends that if the "[Examining Attorney]'s position were maintained, numerous registered marks would fail" citing, for example, the registered marks, BEST BUY, STAYIN HOME AND LOVIN IT!, THINKING DIFFERENTLY, "because they can be presented in non-trademark context." Applicant's Appeal Brief 10 TTABVUE 11, also citing

Indeed, there is no requirement that the Examining Attorney establish that a particular online source or website "has significant web traffic" to establish its competence, just as with print articles, the Examining Attorney need not establish the circulation of the magazine or newspaper or that the cited article has actually been read.[40] USPTO examining attorneys are trained to use reliable sources, but certain Internet evidence may warrant additional scrutiny, and applicants are always free, in rebuttal, to challenge the probative value of a particular website cited in support of a refusal with evidence that may impact the probative value the Board accords the source. *See In re Country Music Assn. Inc.*, 100 USPQ2d 1824, 1829-1830 (TTAB 2011) (finding "some merit in applicant's argument that the examining attorney's Internet evidence of third-party usages are relatively obscure" based on

---

to footnote 16. Those slogan marks Applicant cites entirely differ from its INVESTING IN AMERICAN JOBS slogan thus rendering Applicant's argument to be entirely speculative. Additionally, its proposed mark, unlike the marks it cites, identifies an important and current societal issue of advancing employment opportunities in the United States through the promotion of American manufacturing, tourism, infrastructure development and education.

[40] Applicant's citation to *In re Thomas*, 79 USPQ2d 1021, 1026 (TTAB 2006) (explaining need for context in evaluating Internet search results) is misplaced. 10 TTABVUE 9. The applicant in *Thomas* submitted Internet search summaries to show the "number and nature of similar marks *in use* on *similar* goods" which was found unpersuasive as it consisted of "Google hits for 'black market' with jewelry, without any context for the hits…. [S]ome of the website summaries in the list are so abbreviated that the context of use, such as the specific nature of the business or the particular goods or services offered on the various websites or in connection with the term 'black market,' is unclear." 79 USPQ2d at 1026. The Board found that the search summaries did not adequately show the context in which the mark was used, and "without evidence as to the extent of third-party use, such as how long the websites have been operational or the extent of public exposure to the sites, the probative value of this evidence is minimal." *Id.* Here, by contrast, the Examining Attorney has submitted more than mere Internet search summaries. Moreover, the Internet evidence is introduced to show use of the phrase "investing in American jobs" in a non-trademark, ordinary-meaning manner, not to show weakness of a mark by third-party use of the phrase as a mark as in *Thomas*.

data obtained from the www.Alexa.com web site measuring the daily visitors and page views for applicant's website and each third-party website). However, simply criticizing the evidence in the manner Applicant does is not enough and does not prove anything. Even websites that are not frequently visited still demonstrate how the authors use the term or phrase and how that term or phase will be perceived by the readers.

We also are not troubled by Applicant's suggestion that the Examining Attorney's search strategy may have increased the likelihood of returning uses of the involved phrase that are informational in nature. Examining attorneys are expected to search for relevant evidence and that type of search and evidence would be relevant for a refusal based on the phrase being merely informational.

We find that the third-party usage examples provided by the Examining Attorney show that people are exposed to the ordinary meaning of the phrase "investing in American jobs" in everyday life from many different sources to promote the same message and ideas as Applicant. The evidence shows common usage of the phrase "investing in American jobs" by commercial businesses in various industries, as well as in media articles and blogs, to convey the goal or aim of investing in U.S. business to promote employment opportunities in America. The fact that the phrase "investing in American jobs" is used in the titles and texts of numerous articles for a wide range of activities that result in various employment opportunities for American workers, as well as promotion of the U.S. economy, highlights the emphasis being placed on American jobs. The Board has previously acknowledged the public policy

considerations in allowing businesses to encourage purchasers to give preference to American-made products, and affirmed the refusal to register the merely informational slogan PROUDLY MADE IN THE USA, recognizing, "It is common knowledge that … American manufacturers are anxious to encourage purchasers to give preference to American products." *In re Remington Prods.*, 3 USPQ2d at 1715. The evidence submitted by the Examining Attorney reflects that the closely related goal of American businesses to encourage purchasers to give preference to products made or assembled by American workers is also widely touted and pursued.

Turning to Applicant's argument that its evidence is entitled to more weight than the Examining Attorney's evidence, we disagree. None of Applicant's evidence demonstrates that the public primarily perceives INVESTING IN AMERICAN JOBS as a mark for the applied-for services rather than the basic informational message conveyed by the phrase.

Applicant's listing of excerpts from its website as "top Internet search results for the verbiage"[41] shed no light on what impression the term INVESTING IN AMERICAN JOBS, when served up in those "top" results, makes on consumers. The Google search result summaries illustrate little more than Applicant's size, marketing and promotional efforts, and the quality of the search engine optimization techniques it claims to use.[42] Moreover, several of the listings in the search-result summaries show that Applicant is using the phrase "investing in American jobs"

---

[41] Applicant's Appeal Brief 10 TTABVUE 10.

[42] Applicant's Appeal Brief 10 TTABVUE 11, citing to Exhibit 3 of the January 4, 2017 Request for Reconsideration regarding Google's statements on PageRank.

precisely within the core meaning of the words and not as a source-identifier. Examples include: "At Walmart, we're taking action and creating opportunity by investing in American jobs."; "Walmart has announced plans to create opportunities for American manufacturing by 'investing in American jobs.'"; "Walmart is investing in American jobs!"; "What does investing in American jobs mean?"[43] Although those searching the Internet may encounter the phrase in top search results that connect to Applicant's websites, and those websites may well have many visitors, the relevant inquiry is not how many consumers see the phrase but whether they perceive it as a source-identifier, and this evidence simply fails to show that.

Applicant's evidence of corporate promotional expenditures, attendance at Walmart events, and website traffic statistics fares no better.[44] As in *Remington Products*, "[w]hile applicant may have had substantial sales and advertising of its product, that does not prove recognition by the public of the subject slogan as a trademark." 3 USPQ2d at 1715. Due to its informational nature, INVESTING IN AMERICAN JOBS, like the other informational slogans referenced above, would not be regarded as signifying the source of Applicant's services. Not every designation adopted with the intention that it perform a trademark function necessarily accomplishes that purpose, even if labeled as a trademark. *In re Eagle Crest*, 96

---

[43] *See* for example evidence submitted with the June 13, 2016 Response to Office Action at Exhibits B and C at TSDR 62, 65.

[44] *See* Applicant's Appeal Brief 10 TTABVUE 13; Request for Reconsideration, Exhibit 4 Taliaferro Declaration at TSDR 125-27. *See also* June 13, 2016 Response to Office Action, Exhibit D, at TSDR 67-79.

USPQ2d at 1229 (citing *Am. Velcro, Inc. v. Charles Mayer Studios, Inc.*, 177 USPQ 149, 154 (TTAB 1973)); *In re Volvo Cars*, 46 USPQ2d at 1460-61.

We add that even a showing that consumers associate a phrase with a particular goods or services provider does not allow the provider to remove the term from the common lexicon. *See Am. Online v. AT&T*, 57 USPQ2d at 1909-10 ("Stated otherwise, the repeated use of ordinary words functioning within the heartland of their ordinary meaning ["You Have Mail"], and not distinctively, cannot give AOL a proprietary right over those words, *even if an association develops between the words and AOL*.") (emphasis added); *In re Wakefern Food*, 222 USPQ at 79 (finding applicant's evidence that consumers associate WHY PAY MORE! with applicant entitled to relatively little weight where applied-for mark does not perform the function of a trademark); *In re Water Gremlin Co.*, 635 F.2d 841, 208 USPQ 89, 90 (CCPA 1980) (proof that some consumers may associate particular words with a company is not probative where a mark is not used as a source-indicator because "[n]ot all designs or words which in fact indicate or come to indicate source will be restricted in use to a single merchant"); *cf. In re J. Hungerford Smith*, 126 USPQ at 373 (not addressing applicant's evidence of acquired distinctiveness because the applied-for term failed to function as a trademark). Indeed, when evidence shows, as it does here, that others besides an applicant are using a phrase in an informational manner, the burden on the applicant claiming exclusive ownership and a right to exclude others from use increases. *See In re Tilcon Warren*, 221 USPQ at 88 (in light of evidence that the designation failed to function as a trademark, burden shifted to applicant to establish by competent

evidence that applied-for mark serves a trademark function). Thus, even if there were evidence that some consumers associated the phrase with Applicant, that alone would not entitle Applicant to appropriate for itself exclusive use of an otherwise common informational phrase and thereby attempt to prevent competitors or others from using it to promote their efforts to support American workers.[45] *Cf. KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 72 USPQ2d 1833, 1838 (2004) ("there [is] no indication that the [Lanham Act] was meant to deprive commercial speakers of the ordinary utility of descriptive words"); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 224 USPQ 327, 332 (1985) (Lanham Act among other things prevents "commercial monopolization" of descriptive language in the public domain).

In sum, the evidence submitted by the Examining Attorney showing widespread use of the phrase "investing in American jobs" in an informational sense to encourage ventures such as manufacturing of goods in the U.S. and employment in the U.S. further supports our finding that the consuming public will not perceive INVESTING IN AMERICAN JOBS used by Applicant for the applied-for services as an indicator of a single source of the services. Rather, consumers will perceive the words merely

---

[45] It has been noted that "as a matter of competitive policy, it should be close to impossible for one competitor to achieve exclusive rights in common phrases or slogans." *In re Eagle Crest*, 96 USPQ2d at 1230 (quoting 1 J.T. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:23 (4th ed. 2010)); *In re Volvo Cars*, 46 USPQ2d at 1460. To grant Applicant exclusive rights for retail store services, and for promoting public awareness for goods made or assembled by American workers, in this commonly used phrase would interfere with the rights of other retailers to freely use the familiar phrase or variations thereof to promote investment in the U.S. labor force.

as conveying the common, informational message that Applicant, like others, promotes American-made goods by investing in American jobs.

### C. Third-Party Registrations for "INVESTING IN . . ." formative marks

Applicant also asserts "that past [US]PTO practices have overwhelmingly allowed formulations of 'INVESTING IN …' to register in Class 35," pointing to a collection of registrations and allowed applications for what Applicant considers to be similar marks, and that this additionally supports its contention that its "widespread usage of INVESTING IN AMERICAN JOBS . . . sufficiently functions as a mark to entitle it to registration."[46] Applicant contends that these prior decisions of examining attorneys to allow registration of marks that begin with the wording "INVESTING IN" support registrability of the applied-for slogan noting "these decisions . . . should serve as a guide and as evidence of consumers' perceptions in the marketplace" and that "such registrations are much more persuasive on the current topic of registrability than the Examiner's proffered evidence."[47] We disagree.

At the threshold, most of the marks Applicant cites are the subject of cancelled registrations, abandoned applications, or pending applications and none of these categories provide probative support for Applicant's argument.[48] *See In re Hartz Hotel*

---

[46] Applicant's Appeal Brief 10 TTABVUE 14.

[47] Applicant's Appeal Brief 10 TTABVUE 15-16.

[48] *See* June 13, 2016 Response to Office Action, Exhibit F at TSDR 84-85, 93 and January 4, 2017 Request for Reconsideration, Exhibit 6 at TSDR 135-140 regarding Registration Nos. 2686587 for INVESTING IN AMERICA & Design; 2771538 for INVESTING IN AMERICA; 3156068 for INVESTING IN AMERICA'S COMMUNITIES; 3743467 for INVESTING IN THE WORLD'S FORESTS; 3908252 for INVESTING IN INVENTION which have been cancelled, and Application Serial No. 85927942 for INVESTING IN PEOPLE which is abandoned; and accordingly, have not been considered. It is well-established that an expired

*Servs. Inc.*, 102 USPQ2d 1150, 1152 n.5 (TTAB 2012) (four cancelled registrations submitted by applicant not considered); *In re Mr. Recipe, LLC*, 118 USPQ2d 1084, 1089 (TTAB 2016) ("a pending application is evidence only that the application was filed on a certain date"); *In re Brown-Forman Corp.*, 81 USPQ2d 1284, 1286 n.3 (TTAB 2006) (expired or cancelled registrations generally are evidence only of the fact that the registrations issued).

Disregarding the cancelled or expired registrations, or applications that have either been abandoned or have not yet matured to registrations, there are only two active registrations in Class 35 remaining,[49] Registration Nos. 3595749 for INVESTING IN INNOVATION and 4372980 for INVESTING IN RELATIONSHIPS, both for consulting services. Those registrations were issued at an earlier time for different marks, for different services or goods, and based on evidence and argument that are not of record. They are not evidence of consumers' perception of the different mark INVESTING IN AMERICAN JOBS for promoting public awareness for goods made or assembled by American workers and retail store services.

Our primary reviewing court has long and consistently warned against making factual findings in cases based on allowances by individual examining attorneys in prior cases. *See, e.g.*, *In re Harris-Intertype Corp.*, 518 F.2d 629, 186 USPQ 238, 240

---

or cancelled registration is evidence of nothing but the fact that it once issued. *Sunnen Prods. Co. v. Sunex Int'l Inc.*, 1 USPQ2d 1744, 1747 (TTAB 1987). The same applies to the two pending applications Applicant cites, Application Serial Nos. 86831993 for INVESTING IN ILLINOIS and 86838380 for INVESTING IN ILLINOIS & Design. January 4, 2017 Request for Reconsideration, Exhibit 5 at TSDR 131-133.

[49] June 13, 2016 Response to Office Action, Exhibit F at TSDR 91, 98.

(CCPA 1975) ("We do not know what evidence was before the PTO when the applications were considered, so the citations have no precedential value."). We must assess registrability in each case before us on its own evidentiary record. *See, e.g., In re Cordua Rests., Inc.*, 823 F.3d 594, 118 USPQ2d 1632, 1635 (Fed. Cir. 2016); *In re Shinnecock Smoke Shop*, 571 F.3d 1171, 91 USPQ2d 1218, 1221 (Fed. Cir. 2009); *In re Nett Designs, Inc.*, 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001) ("Even if some prior registrations had some characteristics similar to [applicant's] application, the PTO's allowance of such prior registrations does not bind the board or this court.").[50] Additionally, registrability must be assessed based on the record of public perception at the time registration is sought. *See In re Chippendales USA Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686-1687 (Fed. Cir. 2010); *In re Morton-Norwich Prod., Inc.*, 671 F.2d 1332, 213 USPQ 9, 18 (CCPA 1982).

Here, our analysis must focus on Applicant's applied-for mark and its use in the marketplace, rather than on registrations for other marks conveying different messages, especially when the evidence demonstrates that the phrase INVESTING IN AMERICAN JOBS is commonly used in the marketplace to convey a particular social and economic informational message. Accordingly, we find that the existence of two other current registrations for different marks beginning with the words "INVESTING IN …" for different services lacks probative force as to consumer

---

[50] It would be pure speculation for us to try to divine, from the mere act of one examining attorney of allowing an application to register, the reasons behind the allowance. Moreover, examining attorneys' decisions on individual applications do not set agency policy concerning the governing statutes.

perception of INVESTING IN AMERICAN JOBS for the applied-for services in light of the specific evidentiary record in this case.

**Conclusion**

Based on the record in this case, Applicant's proposed mark INVESTING IN AMERICAN JOBS fails to function as a service mark for retail store services or for promoting public awareness of goods made or assembled by American workers. As used by Applicant, it would be perceived by customers as a merely informational phrase, not a "merchandising short-cut" that indicates the source of Applicant's services and distinguishes them from those of others.

**Decision**: The refusal of registration under Trademark Act Sections 1, 2, 3 and 45, 15 U.S.C. §§ 1051-1053, 1127, is affirmed.